I would like to reserve two minutes for rebuttal. This case revolves, it seems to me, around one salient issue, and that is whether the petitioner's prior attempts to obtain relief using false information bars him from reopening his case based on his true identity and what happened to his family in Nepal. The Board of Immigration Appeals basically says that the evidence that he submitted was not sufficient, it's not sufficiently reliable, and it was not for its authority. It cites no authority from this Court, and this Court's decision in Bakken v. Mukesu says that any procedure that authenticates the document can be relied on. In this case, the petitioner provided an affidavit explaining what happened, which I believe authenticates the document. Perhaps more importantly, there are two expert affidavits that were filed with this motion to reopen. One from Professor Thomas Marks, who's an expert on Nepal, and the other from Dr. Raquel Ackerman, who's a psychoanalyst, who spent ten hours with the petitioner and evaluated him, believing that he's suffering from post-traumatic stress disorder. Was he the psychologist who found Mr. Klein to be a broken and chronically traumatized individual? Yes, Your Honor. And I think the Board of Immigration Appeals has confused two issues here. Well, tell me though, all right, from the standard of review standpoint, the things that you have against you are that he came in 1990, he applies for asylum, and now says that that was a false application, but he says that that was because of a notario or whatever. He doesn't show up for his immigration hearing then. His first motion to reopen is in 2000, which he's still claiming he's from India. And then for the very first time in 2011, that's when he says he's from Nepal. So I know part of what you raise is you're saying that on a motion to reopen, you can't weigh credibility, but everything that he claims that things that are undisputed are inconsistent. So if you look at the standard of review, how can we say that the BIA erred? I mean, there's two ways that you can look at it, but there's some fairly significant damning information against your client. I understand that, but I think that you can use a de novo standard in the Board's application of the law. They certainly didn't apply the law of this circuit or even look at the law of this circuit. They relied only on their own precedent. Now, I'm curious how you get to de novo. I mean, a motion to reopen generally, it doesn't start at de novo, does it?  Right. I think the Board has abused discretion, number one, based on the number of precedents in this circuit which don't require the 287.2. Well, he's never had a hearing. He's never had a hearing. How long have you represented him? Well, our firm, I believe, filed this motion to reopen in 2012, but we were not involved in any of the underlying matters. When you filed that motion, did you use the same set of false facts? No. You used a new. That was the whole point, was that when we had him evaluated by the psychoanalyst, we had his information evaluated by Professor Marks specifically to determine for our own purposes that what he was claiming was correct. This failed at mediation, right? There was an attempt to mediate this. There was mediation. I don't believe that it was successful. But the issue. When did the mediation take place? Refresh my memory. I think there was mediation over the summer, is my recollection. I was not involved in the. . . I want to say, I think it was. . . I thought you'd been representing him. Our firm has been. My co-counsel, David Garner. I think it was referred to mediation January 5th of 2015. It was released from mediation on July 29th of 2015. That's my understanding. But I believe that the board has ultimately confused two issues. There's one issue as to whether he should get a hearing, whether the case should be reopened to give him a hearing at which these issues can be evaluated. And a second issue as to whether he qualifies for asylum or any other relief. But aren't they also saying that because he's now. . . He originally is one person from India. Now he's saying, I am a different person from Nepal. So his identity is at issue. And the board essentially said, you haven't shown you're this person from Nepal. That's correct. But let me point this out, which I believe reopening will actually help the government. Because I don't believe he's been able to have been removed because they have been unable to secure Indian travel documents. So we're not asking. . . We've never asked the board to grant him asylum. We're not asking this court to grant him asylum. We're simply asking the court to allow him to have a hearing. Furthermore, under the Convention Against Torture, we're signatorious to that. And he can't be sent back to Nepal if there's a clear probability that he would be. . . Well, look, so people here in the courtroom know what we're talking about. So this, Mr. Setri, came here 25 years ago. He came here on a visa. He overstayed. And he had some family people here who had a restaurant. And he worked in the restaurant for low wages and long hours and slept in a room with, what, six other people. And then he got married. He had two children born in this country. And then his wife started to beat him up. She used a shoe to beat him up on the head all over. And he says a notarial prepared his first asylum application. And he was unrepresented at the asylum interview. And then he says he was too scared to attend the initial hearing before an immigration judge. And so he didn't show up. And the psychiatrist, Dr. Ackerman, tells us that after she evaluated his mental state, this is what the quote, he is a broken and chronically traumatized individual who has been degraded, humiliated, and emasculated and has exiled from his family life and from his community, has augmented his sense of worthlessness, his chronic post-traumatic stress disorder caused by the way he's been treated, and the overall feeling of hopelessness. And that's the person we're dealing with. Yes, sir. So you're throwing yourself on the mercy of the court. Well, we are throwing ourselves on the mercy of the court, but... Well, that's not a bad thing. But he's never had a hearing. I know that. I know that. I know that. I don't know why you couldn't work something out with the government. Maybe they'll explain it. So he lied. He lied. He lied? Yeah, he lied. So it's not very unusual in this society, is it? No, Your Honor. No. How old is your client? I don't have that off the top of my head. I can give you his birth date. Is he here today? He's 1968. What was that? It's like 1947 or something. How old is he? He was born in 1968. 68, yeah. 68, yes. He's an old man now. He's broken. Let's hear from the government. Thank you. Thank you. So is that what we want to do, is just take this man who's been here 25 years, got two children, he's been beaten up, and we want to throw him out of the country? Is that what we want to do? Good morning. May it please the Court. Daniel Smullo on behalf of the Attorney General. Yeah. Your Honor, and... Is that what the Attorney General wants to do? Your Honor, the Attorney General wishes to apply the law. It is dictated by Congress. And the answer to that question under the law is that the Board did not abuse its discretion here in denying the motion to reopen. We don't know who this man is, quite simply. And we don't know who this man is because he is inconsistent as to his identity, specifically his name, and his country of citizenship. We don't know whether he's Kumar Chetri from India or whether he is Padam Khadka from Nepal. And he has done nothing but lie to this Court, excuse me, not to this Court, but to the immigration authorities, in terms of his first asylum application that he filed affirmatively, the immigration officer found that he lied and referred him to an immigration judge. The individual, and again, I don't... What representation has he had? At first, taking him at his word, he had a notario. Notario, yeah. In 2001, he moved to reopen, and he had a very... And we have any reason to doubt that? None. No. And notarios corrupt our whole system, don't they? They seem to, in large part. And the government knows about it for years and years and years. And yet we say that, for example, that a disbarred lawyer is better than no lawyer. That's what the Justice Department says, right? The Justice Department and Congress has seen fit to say you can have an accredited representative. In 2001, you were about to say... We know about the notarios. You know about them, don't you? It seems unfair to say that all notarios are somehow corrupt or crooked. Well, I haven't met a good one yet. Well, I'll leave that aside. If I could, Your Honor, I'm simply not familiar. Well, you don't know anything about this. Notarios? Yeah. I'm not quite sure what the question is, Your Honor. I apologize for that. Well, I just want to know how... Are you from Washington? D.C.? D.C.? Yes. And so what do you know about notarios out here? Very little, Your Honor. Good. All right. All right, in 2001... In 2001, he was represented by an attorney, Your Honor. And I'll note that he moved to reopen based on a claim of torture in India. Okay? So now this is his second claim to India, represented by a licensed attorney. And that was really rather specific. It was over a single-space page explaining exactly and precisely what happened to him, represented by an attorney. Okay? This court subsequently denied his petition for review, alleging ineffective assistance of counsel. On that motion to reopen, did he attach an affidavit? He did. Yes, Your Honor. That's what I was referring to. That was about a page, single-space. It may have been a bit longer. It was really a rather detailed statement as to all that allegedly occurred to him in India. Now we're up to 2008. He alleges that his family was murdered in Nepal. This is the first time. Well, in 2011, he files it, but he claims in 2008 his family was murdered in Nepal. He submits several documents, none of which are corroborated, not only under the board's, under the Justice Department and DHS regulations, but in any manner. And the board makes note of saying it wasn't corroborated under the regulation or in any other manner, claiming that his family was murdered. And he submits a newspaper article. And what's curious about the newspaper article, Your Honor, and the board points this out, is that the individual, the petitioner, was allegedly in Nepal when his family was murdered, which of course contradicts his claims to this court. And he claims, well, the article was inaccurate. And that comes right back to the abuse of discretion standard. That the article was what? The newspaper article he claims was inaccurate because it has him in Nepal at the time when he claims, and he continues to claim, that he was in the United States at that time. So he acknowledges that the newspaper article that he submitted to bolster his claim is inaccurate. We also have a police report, allegedly from Nepal, that was mailed to him in Nepal. Well, if he was in the United States, it's not clear how he obtained it. He makes no effort to explain that. At the end of the day, what the court is looking at, and it's reviewing for an abuse of discretion, did the board abuse its discretion in denying this motion to reopen, where the petitioner has to prove his identity under the regs to make a prima facie evidence showing that he's eligible for asylum, and we have no idea who he is. And he's admitted lying to immigration authorities at least twice in the past, once with an attorney, once with an attorney. If we credit him completely and say he's from Nepal, then we're sitting with a situation where we have a police report that was mailed to him in Nepal, and he obtained it even though he was somewhere in California, and we also have a newspaper article that has him in Nepal when his family was murdered, when in fact he claims again that he was in California. There is simply no abuse of discretion by the board for finding that this evidence was not sufficient to meet the bare prima facie eligibility for asylum. If there are no further questions, I would... Well, have you worked with counsel that he has now? A colleague in my office has mediated the claim, Your Honor, but it's really unclear what, if anything, can be done for this petitioner. We simply do not know who he is. He has admittedly lied to immigration officials repeatedly. This is somebody who earlier this morning threw himself on the mercy of this court. He is seeking asylum, a government largesse, and he has lied at least twice, maybe more. He also, note, he had an immigration court hearing scheduled, and he was afraid to go. He had the notion, the due process, he skipped it. This is not somebody, this is not a difficult case, Your Honor, for the government. There's just little or anything that can be done for this man who has lied repeatedly over the course of two days. What is the government going to do with him? Remove him to India, as the underlying order, removal order states. If there are no further questions, Your Honor, I'll submit on the government's brief and ask the court to deny the petition for review. What about his children? Children, I understand, are United States citizens, as is his former wife. Now, I don't know certainly what the custody situation is, but they have every right to stay here. They are citizens, as is his former wife. Has he committed any crimes while he's been in this country? Other than lying to immigration officials, not that I'm aware of. Are there no further questions? Thank you, Your Honor. Has he been on public welfare? Not to my knowledge. I don't know. As far as you know, other than lying, he's not violated any laws of this country. Other than lying repeatedly and trying to subvert the immigration system, that is correct. Do you know who he is at this time? No, Your Honor. All right. Thank you. Counsel? I just wanted to respond. What have you done to correct some of these problems? About the newspaper, about the visa? We've stated that that aspect or an aspect of the newspaper article is inaccurate. We've noted that in the— I know, but you haven't even to back it up. Well, but I think what you've stated is it's accurate that those people were killed and that he's their family, but it's inaccurate that he was there. So can you really have it both ways? Well, if a newspaper article is reported and we thought that it shed some light on the issue, I'm not aware of precedent that talks— Is that the only newspaper that covered that incident? That's the only newspaper article I believe that we have on that incident. And no affidavits from any third parties that live in that area? There is a police investigation report, I believe, in the record. What does that show? Investigating the murder of his parents, I believe. And does it talk about him? I don't believe it talks about him. So what the police report shows, a murder of those people, that what the immigration court had a problem with is— I mean, he needs to have a nexus to those people. It's not disputed that those people were murdered, but if they're not his family, for me to claim that I'm somehow aggrieved because certain people were murdered and I have no association with them, that's problematic, wouldn't you agree? You have to have a nexus. If he is not that person, then it's not relevant that those people were murdered. Correct? Correct, but there is also his identity document in the record. And Professor Marks had looked at his statement and what he said and found it very consistent with his in-depth knowledge of Nepal and the issues that have gone on in Nepal. Again, I think it boils down to the issue, should he get a hearing, not whether he's met the threshold that he should be granted asylum. But he had a chance at a hearing and he didn't show up. That's true, but as Judge Pragerson had noted, the psychoanalyst has evaluated him as a completely broken man. So it's true, we're not saying that he didn't lie, we're— All right, thank you. All right, this matter is submitted.
judges: Pregerson, D.W. Nelson, Callahan